# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Frederick J. Kapala | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 08 C 50078 | DATE | 3/9/2012 |
| CASE TITLE | Bergstrom, Inc. vs. Glacier Bay, Inc. | | |

**DOCKET ENTRY TEXT:**

The parties' objections [249] [250] are overruled in part and sustained in part. The Special Master's Report and Recommendation [230] is accepted as modified. Glacier Bay's motion for an order of reference of any summary judgment motions relating to infringement and/or validity to the Special Master [254] is denied.

■[ For further details see text below.]

Docketing to mail notices.

## STATEMENT

Plaintiff, Bergstrom, Inc., sued defendant, Glacier Bay, Inc., alleging infringement of United States Patent Nos. 7,448,227 ("the '227 Patent"), 7,454,922 ("the '922 Patent"), 7,591,303 ("the '303 Patent"), and 6,889,762 ("the '762 Patent"). The patents are directed to heating, ventilation, and air conditioning systems for use in over-the-road trucks and other vehicles which can operate with the engine on or off. Given the technical nature of the patents in suit, and with the consent of the parties, the court appointed Roy E. Hofer, of Brinks, Hofer, Gilson & Lione, as Special Master to oversee the claims construction process. The Special Master conducted a hearing pursuant to Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996), and issued his report and recommendation regarding claim construction. Both parties filed objections to the report and recommendation. After careful de novo review of the Special Master's factual findings and legal conclusions, see Fed. R. Civ. P. 53(f), the parties' objections are overruled with the exception of Bergstrom's objection to construction of the term "life of the battery" and the report and recommendation of the Special Master is adopted as modified. Also before the court is Glacier Bay's motion for an order of reference of any summary judgment motions relating to infringement and/or validity to the Special Master. That motion is denied for the reasons set forth below.

### I. BERGSTROM'S OBJECTIONS

Bergstrom objects to 7 of the 29 claim constructions recommended by the Special Master: (1) Claim Term 3: "Minimum Speed;" (2) Claim Term 8: "Life of the Battery;" (3) Claim Term 13: "Air Conditioning System;" (4) Claim Term 14: "A Vehicle Air Conditioning System Operable to Provide Engine On and Engine Off Operation;" (5) Claim Term 22: "Air Conditioning System Temperatures;" (6) Claim Term 27: "First Speed;" and (7) Claim Term 28: "Second Speed."

In patent infringement litigation, courts construe patents as a matter of law. See Markman v. Westview Instruments, Inc., 517 U.S. 370, 377-90 (1996). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303,

1312 (Fed. Cir. 2005) (quotation marks omitted). The "words of a claim are generally given their ordinary and customary meaning." Id. at 1312 (quotation marks omitted). Even a claim term with a common meaning should be construed where the parties dispute the scope of the term. O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd., 521 F.3d 1351, 1361 (Fed. Cir. 2008). "A determination that a claim term needs no construction or has the plain and ordinary meaning may be inadequate when a term has more than one ordinary meaning or when reliance on a term's ordinary meaning does not resolve the parties' dispute." Id. (quotation marks omitted). In construing a claim term, the "intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history . . . is the most significant source of the legally operative meaning of disputed claim language." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). The specification is "the primary basis for construing the claims," Phillips, 415 F.3d at 1315 (quotation marks omitted), but judges are also free to consult dictionaries, id. at 1322.

### A. "Minimum Speed"

This term appears in claims 2, 7, 8, and 16 of the '762 Patent and also appears in claim 7 of the '303 Patent. The Special Master recommended that the term "minimum speed" be construed as "a minimum non-zero operating speed." In arriving at this construction, the Special Master cited a claim in which "minimum speed" is used and states that the compressor "operates" or is "operating at" a "minimum speed." The Special Master reasoned that if the compressor is "operating" it must be doing so at a non-zero speed. The Special Master also quoted portions of the specification which distinguish between when the compressor is operating (between minimum and maximum speeds) and when the compressor is not operating or disabled (a zero-speed condition). The Special Master found that the construction of "minimum speed" as a minimum non-zero operating speed is consistent with the ordinary meaning of the term "minimum speed" citing a dictionary definition of "minimum." This definition includes the use of the term "minimum" as an adjective modifying the term "speed:" "[t]he lowest speed allowed on a highway." Merriam-Webster's Collegiate Dictionary 741 (10th ed. 1993). The Special Master reasoned from this definition that a "minimum speed" posted on a highway would prohibit stopping a vehicle on the highway or operating it at zero speed. The Special Master added that if Bergstrom wanted the term "minimum speed" to cover zero speed, it could have been its own lexicographer.

Bergstrom's proposed construction is "a speed established during operation of the system, which speed is set at a value that maximizes cooling performance of the system." Bergstom contends that the Special Master's construction erroneously excludes zero speed arguing that (1) the specification refers to at least one instance where the minimum speed of the compressor is zero, and (2) the claim language and specification teaches that the applicable "minimum speeds" are set during operation based on the need to minimize the amount of power being drawn from a source and to ensure that the system continues to operate.

The portion of the specification that Bergstrom maintains equates minimum speed with zero speed is as follows: "[s]imilarly, if the requested compressor speed is at a minimum and the discharge air temperature is below the temperature set point, the compressor speed is set to zero, until the discharge air temperature is above the set point for more than a predetermined amount of time." '762 Patent: col. 9, ln. 66 - col. 10, ln. 3. The Special Master found that in context, this reference is to a situation in which the compressor speed is set to zero and the compressor has, in effect, been disabled. The court agrees. The above cited portion of the specification does not equate "minimum speed" with zero speed. Instead, it states that if two conditions are met: (1) compressor speed is at a minimum, and (2) the discharge air temperature is below the temperature set point, then the compressor speed will be set to zero, that is, the compressor will be disabled. The fact that the compressor speed can be set to zero does not demonstrate that the "minimum speed" of the compressor includes zero speed. Furthermore, that the specification provides that the applicable "minimum speeds" are set during operation based on the need to minimize the amount of power being drawn from a source and to ensure that the system continues to operate, also does not demonstrate that the "minimum speed" of the compressor includes zero speed. Zero

speed is the absence of speed, whereas "minimum speed" contemplates some movement.

Thus, the court finds that the claim term "Minimum Speed" does not properly include zero speed because the preponderance of the intrinsic and extrinsic evidence establishes that "minimum speed" means a speed greater than zero. Therefore, Bergstrom's objection is overruled and the Special Master's proposed construction of "Minimum Speed" will be adopted without change.

### B. "Life of the Battery"

The Special Master recommended that the term "life of the battery," appearing only in claim 5 of the '762 Patent, be construed as the "remaining life of the battery during which it can provide the electrical power needed to perform its intended function(s)." At the beginning of his analysis, the Special Master noted that he originally thought that this term had a plain and ordinary meaning and did not need to be construed, then he reviewed the various meanings ascribed to the term by the parties and concluded otherwise. The Special Master began his analysis by pointing out that the term "life" appeared just three times in the specification:

> Indeed, the controller also includes logic that will disable the HVAC system when the vehicle's storage battery has been discharged a predetermined amount so that enough capacity is preserved in the storage battery to start the vehicle and/or to limit the battery discharge level to provide proper <u>life</u> [of] the battery system.
>
> * * * *
>
> However, the controller 30 will not allow an amount of power to be discharged from the battery storage system 34 that would result in an insufficient amount of power remaining available to start the vehicle, or not allow an amount of power to be discharged from the battery storage system that will reduce the <u>life</u> of the system. As such a point is neared, the controller 30 will disable the power output to the compressor 14 thereby shutting down the HVAC system until and unless an additional source of power becomes available or the batteries are recharged. In one embodiment, this point is set at approximately 11.5 volts DC under load, although other set points may be appropriate based on the starting needs of the engine and battery <u>life</u>.

'762 Patent: col. 2, lns. 58-63 & col. 7, lns. 51-64 (emphasis added). Claim 5 of the '762 Patent provides: "[t]he system of claim 3, wherein the predetermined set point is determined by at least one of a starting power requirement of the vehicle's engine, and the life of the battery." '762 Patent: col. 11, lns. 19-21. The Special Master concluded that claim 5 attempts to incorporate the concept stated within the last sentence of the above quoted portion of the specification and adopted a construction of the term "battery life" that explains that concept: "remaining life of the battery during which it can provide the electrical power needed to perform its intended function(s)."

Bergstrom maintains that the term has a plain and ordinary meaning, the Special Master's construction could be interpreted to change that meaning, and his construction should be rejected in favor of the plain meaning of the term. The court agrees with the Special Master that the references in the specification are not particularly helpful. Nonetheless, the court finds that the Special Master's construction of this term permits more than one interpretation. Specifically, the words "during which it can provide the electrical power needed to perform its intended function(s)" could mean (1) one discharge cycle, that is, the remaining electrical power that a battery holds, or (2) the service life of the battery, which is a temporal concept describing the duration that a battery can be expected to serve its intended purpose before it requires replacement. Thus, Bergstrom's objection is sustained and the Special Master's proposed construction of "life of the battery" will be modified to "remaining life of the battery until it needs to be recharged in order to serve its intended purpose."

### C. "Air Conditioning System"

**STATEMENT**

The claim term "air conditioning system" appears in claims 1, 2, and 7, of the '762 Patent; claims 1 and 9 of the '227 Patent; all claims of the '303 Patent; and in claims 1, 4, 9, and 12 of the '922 Patent. The Special Master recommended that the term be construed as "a system for controlling, especially lowering, the temperature of an enclosed space." In arriving at this construction, the Special Master cited the dictionary definition of "air conditioner:" "[a]ny apparatus for controlling, especially lowering, the temperature and humidity of an enclosure." The American Heritage Dictionary of the English Language 27 (New College Edition 1979). The Special Master then reasoned that one with ordinary skill in the art would understand that an "air conditioning system" is a system for controlling, especially lowering, the temperature of an enclosure. The Special Master also noted that if Bergstrom intended the term to have a meaning other than its ordinary and customary meaning, it could have been its own lexicographer and defined "air conditioning system" to mean something different, but did not do so in the patents. The Special Master further noted that his construction did not require the "system" to be operating at all times and found that Bergstrom was impermissibly trying to broaden the claim term.

Bergstrom argues that the Special Master's construction creates ambiguity because it could be interpreted to exclude the other functions performed by the system when it is not providing cooling air such as monitoring power sources, charging batteries, and controlling component operation. However, in response to this argument, the Special Master found that:

> [a]lthough the 'air conditioning system' denotes one function of the system that does not mean that the system cannot perform additional functions, such as those mentioned above, or be a part of a system that also heats and ventilates. So claims directed to an 'air conditioning system' are not limited to cooling air.

Doc. No. 230, 19.

The court agrees with the Special Master's findings. Bergstrom appears to equate "air conditioning system" with the entire invention, when the language of the patents' specification and claims uses the term in a manner that demonstrates that the "air conditioning system" is a component of the invention. For example, the "Brief Summary of the Invention" portion of the specification in the '762 Patent begins with: "the present invention provides a new and improved heating, ventilating, and air conditioning (HVAC) system for an over-the-road vehicle that may be operated regardless of the operational state of the engine," demonstrating that the air conditioning system is a component, and not the entirety, of the HVAC system. Consequently, Bergstrom's objection is overruled and the Special Master's proposed construction of "air conditioning system" will be adopted without change.

### D. "A Vehicle Air Conditioning System Operable to Provide Engine On and Off Operation"

The Special Master recommended that the term "a vehicle air conditioning system operable to provide engine on and off operation," appearing in claims 1, 9, and 12 of the '922 Patent, be construed as "a vehicle air conditioning system capable of providing air conditioning when the vehicle engine is on and off." The Special Master rejected Bergstrom's arguments that attempted to expand this term in the same way Bergstrom attempted to expand the term "air conditioning system." The Special Master indicated that he merely modified the language of this term to make it easier to understand by one with ordinary skill in the art.

As with the previously discussed term, Bergstrom objects to the Special Master's construction of this term on the ground that it impermissibly limits the otherwise broad scope of the system's operation to just that of an air conditioner. Based on the rationale set out in the foregoing section, this objection is similarly overruled.

Bergstrom also argues that the Special Master's recommended construction should be rejected because it makes claim language within claim 12 of the '922 Patent redundant. Claim 12 provides in part: "[a] vehicle air conditioning system operable to provide engine on and engine off operation to provide air conditioning to a sleeping area of the vehicle." '922 Patent: col. 12, ln. 17-19. The Special Master rejected this argument

reasoning that:

> the phrase 'to provide air conditioning' is necessary to clarify the phrase that follows – 'to the sleeping area of the vehicle,' i.e., where the air conditioning is being directed. Otherwise the preamble would be the awkward, unclear phrase, 'A vehicle air conditioning system operable to provide engine on and off operation to sleeping area of the vehicle.'

Doc. No. 230, 19-20. The court agrees with the Special Master's reasoning. Thus, Bergstrom's objection is overruled and the Special Master's proposed construction of "a vehicle air conditioning system operable to provide engine on and off operation" will be adopted without change.

### E. "Air Conditioning System Temperatures"

This claim term appears in claim 9 of the '922 Patent. The Special Master recommended that the term "air conditioning system temperatures" be construed as "a temperature of the refrigerant system used in the air conditioning system." Bergstrom maintains that the plain and ordinary meaning of the term is clear and unambiguous to a person of ordinary skill in the art and the Special Master's construction should be rejected because it imports a limitation that is inconsistent with the specification. Particularly, Bergstrom argues that the specification demonstrates that the system[1] monitors various temperatures, not just "refrigerant system" temperatures and there is no language in the claim nor support in the specification limiting "air conditioning system temperature" to a temperature of the refrigerant system. The Special Master acknowledged that "there are a plurality of temperatures being monitored" by the IPGM controller, but concluded that the "temperatures" of this term must be related to "temperatures" of the components in the "air conditioning system." The Special Master found that in the context of the "air conditioning system," the only "temperatures" referred to in the specification are the "temperatures" in the refrigeration system.[2] The Special Master also found that Bergstrom did not provide any evidence that "temperatures" can be referring to the "temperatures" of any other component in the "air conditioning system." Bergstrom has still not produced such evidence nor has it convinced the court that the Special Master's construction should be eliminated or modified. Consequently, Bergstrom's objection is overruled and the Special Master's proposed construction of "air conditioning system temperature" will be adopted without change.

### F. "First Speed"

The claim term "first speed" appears in claims 11, 13, 16, 21, and 22 of the '303 Patent. The Special Master recommended that the term be construed as "a non-zero speed." In arriving at this construction, the Special Master explained that the claims of the '303 Patent using the term "first speed" use "first speed" to identify the speed of the compressor or fan, or both, when the engine is running and "second speed" to identify the speed of these components when the engine is not running:

> operating at least one of the interior compartment fan and the compressor of the air conditioning system at a first speed when the engine is running; and operating at least one of the interior compartment fan and the compressor of the air conditioning system at a second speed when the engine is not running.

'303 Patent: col. 12, lns. 8-13.

> wherein the step of operating at least one of the interior compartment fan and the compressor of the air conditioning system at the first speed when the engine is running comprises the step of utilizing electric power generated as a result of the engine running to operate . . . the air conditioning system.

'303 Patent: col. 12, lns. 27-33. From this claim language, the Special Master concluded that "[f]or the fan or compressor to provide any air conditioning it must be operating and the term 'first speed' must be a 'non-zero speed.'" Doc. No. 230, 53. The Special Master also cited the following language from claim 22: "wherein the step of operating . . . at the second speed comprises the step of operating . . . at a second speed lower than the first speed," '303 Patent: col. 13, lns. 4-9, and concluded that if the "second speed" is lower than the "first speed," the "first speed" cannot be zero. Doc. No. 230, 53.

Bergstrom contends that the Special Master's construction should be rejected in favor of the term's plain language. Bergstrom maintains that none of the claims reciting the term "first speed" call for limiting that speed to a non-zero speed and that the specification and file history contemplate a speed of zero under certain conditions.

The court finds Bergstrom's contention to lack merit. First, the court agrees with the Special Master's reasoning regarding the use of "first speed" in the context of claim 22. Specifically, because the first speed is greater than the second speed, the first speed must be a non-zero speed. Second, the portion of the specification to which Bergstrom directs the court is the same language it relied upon in objecting to the Special Master's construction of the term "minimum speed" as excluding a zero speed. As with the term "minimum speed," for the same reasons outlined in section II.A. above, the court similarly concludes that this language within the specification does not demonstrate that the term "first speed" includes zero speed. Third, the Special Master quickly dispensed with Bergstrom's prosecution history argument finding it irrelevant because it was not in reference to the term being construed and was not made in the '303 Patent history. Doc. No. 230, 53 n.17. Bergstrom has not explained why this conclusion was erroneous. Therefore, Bergstrom's objection is overruled and the Special Master's proposed construction of "first speed" will be adopted without change.

### G. "Second Speed"

The claim term "second speed" appears in claims 11, 13, 14, 15 and 21 of the '303 Patent. The Special Master recommended that the term be construed as "second non-zero speed different than the first speed." In arriving at this construction, the Special Master reasoned that the claims of the '303 Patent use "first speed" to identify the speed of the air conditioning system[3] when the engine is running and "second speed" to identify the speed when the engine is not running, and if these speeds were the same, there would be no need to distinguish them in the claims.

In objecting to the Special Master's construction of this term, Bergstrom advances the same arguments that it advanced in objection to the Special Master's construction of the term "first speed." As the court noted in section II.F. above, claim 22 provides: "wherein the step of operating . . . at the second speed comprises the step of operating . . . at a second speed lower than the first speed," '303 Patent: col. 13, lns. 4-9. Not only does this language demonstrate that the first speed cannot be zero, because both speeds contemplate operation, it also establishes that the second speed is lower than the first speed. Claims 6 and 11 also support this construction in describing operation "at a speed lower than a maximum speed when the engine is not running" and "at a second speed lower than the first speed when the engine is not running," respectively. '303 Patent: col. 11, lns. 26-28, lns. 60-63.

Bergstrom also argues that the Special Master's construction improperly requires that "second speed" be a speed other than the "first speed" because the specification discloses situations where "second speed" need not be different than "first speed." In particular, Bergstrom cites the following language:

> When the source of electric power utilized is a battery, the controller operates the compressor at a minimum speed to extend duration of operation of the HVAC system. Preferably, the controller monitors the power utilization of the battery and disables operation of the compressor to preserve an amount of power in the battery sufficient to start the vehicle's engine.

'303 Patent: col. 4, lns. 28-35.

> The speed and capacity of the compressor may be increased as needs demand as determined by the controller. However, the controller will not allow an amount of power to be discharged from the battery storage system that would result in an insufficient amount of power remaining to start the vehicle, or not allow an amount of power to be discharged from the battery storage system that will reduce the life of the system.

'303 Patent: col. 7, lns. 55-66.

> While the system is operating from the battery storage system, if the vehicle is connected to a shore power electrical system the controller will sense the availability of this new power source. The controller will then begin utilizing this source to the exclusion of the battery system, and will increase the compressor speed and capacity as needed to maintain the temperature of the interior.

'303 Patent: col. 8, lns. 3-9. The court finds that the foregoing excerpts from the specification do not offend the conclusion that "first speed" is a speed higher than "second speed" as those terms are used in claims 11, 13, 14, 15, and 21 of the '303 Patent. When the engine is not running, the mission of the IPGM is to conserve power. None of the excerpts use the term "second speed." The first excerpt states that the controller operates the compressor at "minimum speed" when a battery is the source of electrical power suggesting that the "second speed" could be equal to the "minimum speed" but not the "first speed." The second excerpt states that the controller can increase the compressor speed when a battery is the source of electrical power, but does not indicate that the controller can increase the speed to equal the "first speed." The third excerpt states that the controller will increase the compressor speed if it detects available shore power, but does not compel the conclusion that the controller can increase the speed to equal the "first speed." Consequently, Bergstrom's objection is overruled and the Special Master's proposed construction of "second speed" will be adopted without change.

## II. GLACIER BAY'S OBJECTION

Glacier Bay objects to the Special Master's explanatory statement that "modulates" includes disabling the compressor within his construction of the term "modulates the speed of the compressor," which appears in claim 1 of the '762 Patent and claims 9, and 13-15 of the '922 Patent. The Special Master concluded:

> that 'setting the speed to zero' and disabling are equivalent and a species of 'modulate,' which Glacier Bay has conceded embraces modulating to a zero speed. This interpretation is consistent with the underlying logic of the controller's operation adjust the speed of the compressor as needed when the electric power is available and turn off the compressor when the electric power is not available, until such time as the power becomes available and the compressor is needed.

Doc. No. 230, 44.

It is important to note that Glacier Bay does not object to the Special Master's construction of this term, only to his explanatory statement. Glacier Bay requests that the court distinguish "modulating" from "disabling" in any explanation or construction of "modulates the speed of the compressor." The court finds that "modulates" includes disabling the compressor and therefore denies Glacier Bay's request.

Glacier Bay advances three arguments in support of its position. First, that the plain language of claims 1 and 3 of the '762 Patent demonstrate that disabling is an additional limitation or feature of the compressor operation and not a species of modulating. The Special Master noted that both Bergstrom and Glacier Bay argued that claims 1 through 3 support their positions that disabling is and is not, respectively, a species of modulating. However, while the Special Master found Bergstrom's argument more persuasive, he decided, and the court agrees, that Bergstrom's argument was not determinative of the issue and that the specification had to be consulted. Claims 1 through 3 of the '762 Patent provide:

**STATEMENT**

> 1. An air conditioning system for use in an over-the-road vehicle, comprising: a variable-speed compressor for providing refrigerant to a heat exchanger positioned to provide temperature control to an interior compartment of a vehicle; a brushless DC motor operably coupled to the variable-speed compressor; an intelligent power generation management controller operably coupled to the motor, the controller receiving electric power from at least one source of electric power operable when an engine of the vehicle is not operating; and wherein the controller modulates the speed of the compressor when the engine is not operating by varying an energization of the motor based on the power capacity of the source of electric power to enable operation of the compressor during an engine off condition.
> 2. The system of claim 1, wherein the source of electric power is a battery, and wherein the controller operates the compressor at a minimum speed to extend a duration of operation of the air conditioning system.
> 3. The system of claim 2, wherein the controller monitors the voltage of the battery, and wherein the controller disables operation of the compressor when the voltage of the battery drops below a predetermined set point.

'762 Patent: col. 10, lns. 58-66; col. 11, lns. 1-15. The court concludes that this language is subject to interpretation and therefore the plain language of the claims does not resolve the issue at hand.

Second, Glacier Bay maintains that the specification demonstrates that the controller modulates the speed of the compressor based on power in a range between a minimum and a maximum speed. The Special Master construed "minimum speed" to be a non-zero speed. Therefore, Glacier Bay argues that disabling, which logically requires zero speed, cannot be a species of modulating because the modulation range explicitly excludes zero speed. The court rejects this argument and agrees with the Special Master to the extent that just because there are many references in the specification to modulating the speed of the compressor between a minimum and a maximum does not mean that modulating is limited to that range. In the face of Glacier Bay's concession at the hearing before the Special Master that modulation of compressor speed includes setting the compressor to zero speed, the term speed in "modulates the speed of the compressor" is a broader term than speed as used in the term "minimum speed."

Third, Glacier Bay argues that the specification discloses four exceptions to modulating, the fourth of which is disabling:

> The controller 30 then modulates the speed and capacity of the compressor to maintain the cab temperature at the user define set point via the PID [proportional, integral, derivative] control, except when certain conditions are encountered. These conditions include [1] a high current/load limit that reduces the compressor speed if the supply current exceeds a predefined current limit. . . . [2] Similarly, if the requested compressor speed is at a minimum and the discharge air temperature is below the temperature set point, the compressor speed is set to zero, until the discharge air temperature is above the set point for more than a predetermined amount of time. [3] Further, if the pressure sensing indicates a fault within the refrigeration the requested compressor speed will also be set to zero. The compressor will be disabled for a predetermined period of time before the compressor is allowed to be operated. [4] Finally, if the battery voltage drops below a predetermined value load the controller will disable all outputs until power has been cycled to the controller or an alternate source of power becomes available.

'762 Patent col. 9, ln. 58 to col. 10, ln. 12. The Special Master determined that the word "modulates" in the first sentence of the above-quoted language refers to both circumstances when (1) compressor speed is controlled by the PID control and (2) the four exceptions when the PID is not in control, including disabling the compressor. The court agrees. The four exceptions merely describe when the PID controller is not in control, they do not

pertain to modulation of the speed of the compressor in general. Therefore, Glacier Bay's objection is overruled.

For the preceding reasons, the parties' objections are overruled in part and sustained in part and the Special Master's Report and Recommendation is accepted as modified.

### III. MOTION FOR CONTINUATION OF THE ORDER OF REFERENCE

Glacier Bay requests that this court enter a continued order of reference to the Special Master of any yet to be filed summary judgment motions relating to infringement and/or validity issues. Glacier Bay argues that the Special Master is already familiar with the technology and the disputed claim terms of the patents in suit such that reference of any summary judgment motions with regard to validity or infringement would conserve judicial resources. Bergstrom opposes a continued order of reference arguing that such an order would be improper because it has not consented and there are no exceptional conditions warranting a continued order of reference to the Special Master.

Federal courts have the inherent power to appoint special masters to aid judges in the performance of specific duties. Constant v. Advanced Micro-Devices, Inc., 848 F.2d 1560, 1566 (Fed. Cir. 1988). "Masters can properly aid the court in evaluating issues of patent validity and infringement in the context of motions for summary judgment, and have often done so." Id. Appointments of special masters are governed by Federal Rule of Civil Procedure 53, which provides in pertinent part:

(1) Scope. Unless a statute provides otherwise, a court may appoint a master only to:

(A) perform duties consented to by the parties;

(B) hold trial proceedings and make or recommend findings of fact on issues to be decided without a jury if appointment is warranted by:

(i) some exceptional condition; or

(ii) the need to perform an accounting or resolve a difficult computation of damages; or

(C) address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district.

Fed. R. Civ. P. 53(a)(1). At this point, the need to perform an accounting or resolve a difficult computation of damages is not implicated in this case. Nor is this court unable to effectively and timely address the forthcoming motions for summary judgment. Consequently, because Bergstrom has not consented, the court may refer summary judgment motions to the Special Master only if appointment is warranted by some "exceptional condition."

The only exceptional conditions Glacier Bay has advanced in support of its motion are the volume and complexity of the claims and the more than three-year pendency of this case. However, the case law cited by Bergstrom establishes that these are not exceptional conditions. See La Buy v. Howes Leather Co., 352 U.S. 249, 256-59 (1957) (finding district court's reference to special master over objection of all parties "amounted to little less than an abdication of the judicial function" and that neither docket congestion, complexity of issues, nor extensive expenditure of time constitute an exceptional condition justifying a Rule 53 reference); Sierra Club v. Clifford, 257 F.3d 444, 447 (5th Cir. 2001) ("The fact that a case has been pending for two years is not so exceptional as to require the reference of dispositive matters such as summary judgment motions to a special master. The same applies to voluminous filings containing highly technical documents and declarations, which is pretty much the norm for modern federal litigation."); In re United States, 816 F.2d 1083, 1088 (6th Cir. 1987) (finding that calendar congestion, complexity of issues, and the public interest in the quickest feasible resolution of the case did not constitute exceptional conditions warranting reference).

Glacier Bay does not take issue with the foregoing authority, but attempts to distinguish it by noting that

**STATEMENT**

they are antitrust and environmental cases, not patent cases. The court is not persuaded that these distinctions vitiate the persuasive value of the cited cases referred to by Glacier Bay. Also, the scholarship and studies cited by Glacier Bay indicating that it is common practice to appoint special masters in patent cases does not permit this court to enter an order of reference over a party's objection without finding exceptional circumstances. Therefore, Glacier Bay's motion for a continued order of reference is denied.

### IV. CONCLUSION

For the foregoing reasons, the parties' objections are overruled in part and sustained in part and the report and recommendation of the Special Master is adopted as modified. Glacier Bay's motion for continuation of the order of reference is denied.

1. The court assumes that the term "system" as used here refers to the IPGM controller.

2. The court assumes that the only temperature monitored within the air conditioning system is the temperature of the refrigerant.

3. When construing the term "minimum speed," the Special Master referred to speed of the compressor. When construing the term "first speed," he referred to speed of the compressor or fan. When construing the term "second speed, " he referred to the speed of the air conditioning system. The court assumes by using the phrase "speed of the air conditioning system" the Special Master meant the speed of the compressor and/or the fan and that these references do not affect the respective constructions.